UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MALCOLM NIRKA,                     :
                                   :CIVIL ACTION NO. 3:15-CV-2409
          Plaintiff,               :
                                   :(JUDGE CONABOY)
          v.                       :
                                   :
CAROLYN W. COLVIN,                 :
Acting Commissioner of            :
Social Security.                   :
                                   :

---

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  (Doc. 1.)  He alleged disability beginning on December 1, 2010. (R. 32.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Timothy Wing, concluded in his February 28, 2014, decision that Plaintiff's severe impairments of spinal disorder with radiculopathy, status post cervical spinal surgery, and bilateral carpal tunnel syndrome did not alone or in combination meet or equal the listings.  (R. 35-36.)  He also found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with certain nonexertional limitations and that he was capable of performing jobs that existed in significant numbers in the national economy. (R. 37-40.)  ALJ Wing therefore found Plaintiff was not disabled as of March 31, 2012, the last date insured.  (R. 42.)

With this action, Plaintiff asserts that the Acting Commissioner's decision should be remanded for the following

reasons: 1) the ALJ erred by finding Plaintiff did not meet his burden at step one and that he engaged in substantial gainful activity after July 2011; 2) the ALJ erred in failing to find any right shoulder impairments to be "severe" and by failing to include any resulting limitations within the RFC assessment; 3) the ALJ did not fulfill his duty to fully and fairly develop the record and erred by not ordering a consultative examination; and 4) the ALJ did not properly evaluate Plaintiff's credibility.  (Doc. 11 at 7-17.)  After careful review of the record and the parties' filings, I conclude this appeal is properly denied.

## I. Background

### A.   Procedural Background

Plaintiff filed for DIB on October 31, 2012.  (R. 32.)  The claim was initially denied on January 9, 2013, and Plaintiff filed a request for a hearing before an ALJ on January 15, 2013.  (*Id.*)

ALJ Wing held a hearing on January 21, 2014.  (*Id.*)  Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Carmine Abraham.  (*Id.*)  As noted above, the ALJ issued his unfavorable decision on February 28, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 41.)

On April 29, 2014, Plaintiff filed a Request for Review with the Appeals Council.  (R. 23-25.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on September

3, 2015.  (R. 1-3.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On December 14, 2015, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on December 10, 2015.  (Docs. 9, 10.)  Plaintiff filed his supporting brief on March 21, 2016.  (Doc. 11.)  Defendant filed her brief on April 4, 2016.  (Doc. 12.)  Plaintiff filed his reply brief on April 28, 2016.  (Doc. 13.)  Therefore, this matter is fully briefed and ripe for disposition.

## B.   *Factual Background*

Plaintiff was born on March 26, 1969.  (R. 40.)  He was forty-three years old on the date last insured.  (R. 40.)  Plaintiff has at least a high school education.  (*Id.*)  He has past relevant work as a lineman and construction laborer.  (R. 40.)  In the November 21, 2012, Disability Report, Plaintiff listed the physical or mental conditions that limited his ability to work: cervical fusion; spinal stenosis; lumbosacral neuritis; and illiterate.  (R. 158.)

## 1.   <u>Impairment Evidence</u>

The following review of evidence focuses on that relied upon by the parties and the ALJ and relevant to the errors asserted by Plaintiff.

In February 2011, Plaintiff's primary care physician, Denise

Klynowsky, D.O., ordered a lumbar spine MRI.  (R. 207-08.)  The
History portion of the report indicates that Plaintiff had an old
compression fracture at T12 and had low back pain radiating down to
the leg for several years which had recently worsened.  (R. 207.)
The study showed mild to moderate left lateral herniated disc at
L2-3 level extending into and beyond the foramina and mild right
paracentral herniated disc at T12-L1.  (R. 208.)  An April 2011 MRI
of the cervical spine done because of a history of cervical
radiculopathy showed the following; multilevel degenerative changes
involving the cervical spine with presence of disk desiccation and
posterior disk osteophyte complexes at multiple levels, most
conspicuous at C4-5 through C6-7; and large posterior central/left
paracentral disk extrusion at C6-7 causing at least moderate grade
spinal canal stenosis, indenting the contour of the cervical spinal
cord.  (R. 218.)

On May 6, 2011, Plaintiff saw Ryan Ness, M.D., and Laurel
Corbin, PA-C, for a consultation regarding low back, neck, leg, and
arm pain.  (R. 220-23.)  Ms. Corbin recorded that Plaintiff
presented with a long history of back and neck pain, progressively
getting worse.  (R. 220.)  Plaintiff complained of pain across his
lower back with radiation along the posterior aspect of his thighs
and the posterolateral aspect of his calves, weakness and numbness
in his legs bilaterally, neck pain bilaterally with radiation down
his arms, and numbness and tingling in his arms but no weakness.

(*Id.*)  He rated his pain at seven out of ten, waxing and waning in nature.  (*Id.*)  Plaintiff reported that his pain was made worse with prolonged standing and sitting, and moving around helped to alleviate it.  (*Id.*)  He also reported that previous treatment included physical therapy, aqua therapy, TENS unit, pain medications (Vicodin, Flexeril and Neurontin) and neurosurgical evaluation at which conservative treatment was recommended.  (*Id.*)  Plaintiff had not previously had epidural injections and was taking Vicodin and Flexeril for pain control.  (*Id.*)  Physical examination of the neck showed that it was supple and the range of motion was intact.  (R. 222.)  Physical examination of the back showed no CVA tenderness and no spinal tenderness.  (*Id.*)  Plaintiff had full 5/5 strength in all muscle groups in his upper and lower extremities.  (*Id.*)  Axial spine examination showed minimal tenderness to the paracervical region, tenderness to his trapezius bilaterally, and positive tenderness to his lumbar facets bilaterally.  (*Id.*)  In evaluating the lumbar and cervical range of motion, it was recorded that Plaintiff had pain with lumbar flexion greater than ninety degrees, pain with lumbar extension less than fifteen degrees, and pain with cervical extension greater than fifteen degrees.  (*Id.*)  He also had pain with cervical rotation, right greater than left.  (*Id.*)  Dr. Ness administered a lumbar spine injection and a trigger point injection, and Plaintiff was directed to remain active as tolerated, continue with his

medication regimen, and return in one month.  (R. 223-25.)  After
the injections, Plaintiff reported no numbness or tingling in his
extremities and a pain score of two.  (R. 230.)

Plaintiff was again seen in Dr. Ness's office on June 10,
2011, by Rachel Chitswara, PA-C.  (R. 234.)  He reported that he
had pain in the neck, numbness into his hands bilaterally, low back
pain, no weakness in his arms or hands, and poor balance.  (*Id.*)
He said he wanted to address his cervical region to see if this
helped his neck and low back.  (*Id.*)  Plaintiff reported that he
got some relief with the previous injections.  (*Id.*)
Musculoskeletal physical examination showed good strength, negative
Spurlings, and that Plaintiff was not able to stand on one leg.
(*Id.*)  His neurologic exam showed upper and lower extremity
strength symmetric and equal bilaterally.  (*Id.*)  Assessment was
"42 year old male with cervical disc displacement."  (*Id.*)  Ms.
Chitswara discussed a cervical epidural steroid injection and the
possible need for surgery in the future.  (*Id.*)  Plaintiff had a
follow-up scheduled with a surgeon and agreed to proceed with the
injection.  (*Id.*)  After the procedure, Plaintiff reported a pain
score of three, tingling in his fingers on both hands, and no
numbness.  (R. 240.)

On July 15, 2011, Ms. Corbin recorded that Plaintiff had
reported a 50% reduction in pain for one and a half weeks after his
previous injections.  (R. 245.)  He also said he was able to mow

6

his grass and get back to other activities. (*Id.*) At the time of the visit, Plaintiff reported pain at the base of his neck with radiation into his trapezius and down his arms bilaterally. (R. 246.) Dr. Ness again administered steroid and trigger point injections for his left-sided pain and noted that Dr. Jacobs would see him regarding surgery. (R. 244.) Plaintiff tolerated the procedure well, had no numbness or tingling, and rated his pain as one. (R. 246, 251.) He was directed to remain active and continue his medications. (R. 246.)

On August 26, 2011, Dr. Ness noted that Plaintiff had a 50% reduction in pain lasting several weeks after the CESI for neck pain, but his right arm had been more painful in the preceding two to three days and it was getting difficult to use the arm. (R. 255.) Plaintiff's muculoskeletal examination showed tenderness to his trapezius on the right, pain with extension and rotation to the right, and negative Spurlings. (*Id.*) Neurological motor examination showed right arm muscle groups strength preserved, and range of motion difficult due to pain. (*Id.*) Dr. Ness's assessment was "42 year old male with brachial neuritis, severe cervical stenosis." (R. 255.) He prescribed a Medrol Dose Pak and arranged for Plaintiff to be seen by a neurosurgeon. (*Id.*)

In November 2011, Darren L. Jacobs, D.O., of Geisinger Medical Center recorded that Plaintiff had cervical disk disease and lumbar radicular disease and that he had recently had some adverse

7

reactions to Dr. Ness's injections to which he had previously been responding. (R. 263.) Plaintiff wanted to pursue surgical options due to worsening numbness, tingling, and pain in the right arm. (*Id.*) On examination, Plaintiff had 5/5 power in all distributions but the right deltoid showed give-away weakness due to pain, his upper extremity range of motion was limited due to pain, and he had an antalgic gait. (R. 263-64.) Dr. Jacobs performed an anterior cervical diskectomy at C5-7 and C5-7 fusion with structural cage. (R. 264.)

In a post operative follow up on November 22, 2011, Plaintiff reported that he was feeling well and was anxious to get back to work. (R. 410.) He reported that he had no neck pain and the arm pain that was his primary pre-operative symptom had completely resolved. (*Id.*) Plaintiff was still taking Vicodin for end-of-the-day pain and requested Percocet instead. (*Id.*) Regarding Plaintiff's request to be released to go back to his construction job, Dr. Jacobs discussed his work limitations and cautions, and Plaintiff agreed that he would take it easy and ask his coworkers for assistance in lifting. (*Id.*) Dr. Jacobs released Plaintiff to go back to work: light duty with no heavy lifting. (*Id.*)

Dr. Jacob's Progress Notes dated January 10, 2012, indicate that Plaintiff had been doing well post surgery but he twisted his neck/sneezed vigorously and felt a pop about two weeks before Christmas. (R. 473.) Plaintiff complained of arm pain, right

8

shoulder pain and difficulty lifting his arm over his head, and he was unable to return to work. (*Id.*)  Dr. Jacobs noted that the right rotator cuff was weak and Plaintiff had severe pain with internal and external rotation. (*Id.*)  X-rays showed stable alignment and good hardware configuration. (*Id.*)  Dr. Jacobs also noted that Plaintiff needed MRI of the neck and rotator cuff and referred Plaintiff to an orthopedic doctor. (*Id.*)  Plaintiff was to return to Dr. Jacobs after the MRI and orthopedic evaluation. (*Id.*)  At the same visit Plaintiff was seen by Luann Byerly, PA-C. (*Id.*)  Plaintiff told Ms. Byerly that after the sneezing incident, he noted pain radiating down both arms from shoulder to wrist, right greater than left, and the pain differed from the pre-op pain. (*Id.*)  He also complained of bilateral arm numbness and weakness, and radiating left leg pain. (*Id.*)  On examination, Ms. Byerly found the neck range of motion limited and motor and sensory responses normal in all extremities. (R. 474.)  He had positive Tinel's on the right. (*Id.*)  The Impression was recurrent bilateral upper extremity pain, worse on the right. (*Id.*)  At the time of the visit, Plaintiff rated his pain as three on a scale of one to ten. (R. 475.)

In a January 27, 2012, MRI of the cervical spine, Robert Snowden, M.D., recorded the following Impression: "Status post C5 to C7 ACDF.  No residual spinal canal or neuroforaminal stenosis is appreciated." (R. 501.)  The Impression of Plaintiff's shoulder

MRI of the same date indicated the following: "1. Moderate supraspinatus and infraspinatus tendonopathy with mild interstitial tearing, possible surfacing to the bursal side . . . .   No full thickness rotator cuff tear is demonstrated.  2.  Mild subacromial/subdeltoid bursitis.  3.  Labral degeneration."  (R. 502.)

Plaintiff returned to see Dr. Jacobs on February 22, 2012. (R.646.)  In the history portion of the Clinic Notes, Plaintiff provided the same description of the December sneezing incident and aftermath as he had in January.  (*See* R. 473, 646.)  He again complained of bilateral arm numbness and weakness, right greater than left, and radiating left leg pain.  (R. 646.)  He denied gait disturbance.  (*Id.*)  Physical examination showed the following: Neck ROM limited; Motor - grossly 5/5 all extremities; Sensory - grossly intact to light touch in upper and lower extremities; deep tendon reflexes - 2+ and symmetric throughout; plus Tinel's on the right and negative on the left; negative Phalen's bilaterally. (*Id.*)  Plaintiff said the pain was located in his neck, shoulder, and wrist; he rated his pain as eight on a scale of one to ten at the time of the visit.  (R. 648.)   Dr. Jacobs noted that cervical spine x-rays showed good alignment following the cervical discectomy and fusion and the January 27, 2012, MRI of the cervical spine revealed good alignment and no gross stenosis of the canal or neural foramen.  (R. 646.)  His "Impression" was "recurrent

10

bilateral UE pain, worse on right." (*Id.*)  Dr. Jacob's "Plan" was to get an EMG of the upper extremities, await the evaluation of the orthopedic physician, and "consider right C5-7 laminoforaminotomy, if there is no orthopedic solution, however this would be a low-likelihood of success." (*Id.*)

On the same day as his visit with Dr. Jacobs, Plaintiff had an office visit with G. Dean Harter, M.D., a Geisinger orthopedist, for evaluation of his right shoulder pain. (R. 653-55.)  Dr. Harter noted that Plaintiff's right shoulder MRI showed partial thickness rotator cuff tear, no full thickness tear was identified, and tendonitis of the rotator cuff. (R. 653.)  He further noted that Plaintiff underwent cervical spine surgery by Dr. Jacobs in November 2011 and "most of his symptoms were of the upper right extremity." (*Id.*)  Dr. Harter reported that "[h]e has good resolution of symptoms at this point in time but continued shoulder pain anterolateral in nature. . . . Patient denies any neurologic changes about the bilateral upper extremities without any numbness or tingling.  Does complain of pain in the forearm and the hand and wrist, which typically is not shoulder pain." (R. 653-54.)  Plaintiff complained of mild to moderate pain which interrupted his sleep. (R. 654.)  Dr. Harter added that Plaintiff had "[n]o other complaints, other than already noted." (R. 654.)  Plaintiff said the pain was located in his right shoulder; he rated it as seven on a scale of one to ten at the time of the visit. (R. 657.)  His

"Social History" stated that he was employed as a "constructor" and was not retired.  (R. 654.)  Following physical examination, Dr. Harter assessed "[i]mpingement syndrome right shoulder with a history of cervical spine surgery with radicular symptoms mainly down the right upper extremity."  (R. 655.)  He recommended injections, but Plaintiff refused because he previously had developed thrush or yeast infections with steroid medications. (*Id.*)  Alternatively, Dr. Harter recommended physical therapy for scapular stabilizers and rotator cuff strengthening.[1]  (*Id.*)

Plaintiff saw Dr. Klynowsky on February 23, 2012, with the chief complaint of continuing pain after neck surgery for which he was told to follow up with his primary care physician for chronic pain medications.  (R. 523.)  The Problem/Diagnosis List indicated lumbar pain, chronic lumbosachral pain, and cervical disc herniation (the same as had been recorded in November 2011).  (R. 522, 524.)  No physical examination was recorded.

Plaintiff's next visit of record was with Dr. Klynowsky on August 3, 2012, where it was noted that Plaintiff complained of continuing back and neck pain.  (R. 529.)  Review of Systems indicated that Plaintiff denied muscle weakness, pain, and joint stiffness, numbness, tingling, tremors or weakness.  (R. 529-30.) Physical examination showed that Plaintiff's neck was supple with

---

[1]  The record does not contain physical therapy treatment notes during 2012.

full range of motion, he had full range of motion in his
extremities, his motor strength was 5/5 throughout, deep tendon
reflexes were +2 throughout, sensory intact, and gait within normal
limits.  (R. 530.)

In September 2012, Dr. Klynowsky recorded that Plaintiff said
that a specialist was trying to talk him into lumbar spine surgery.
(R. 525.)  Review of Systems indicated that Plaintiff reported
joint stiffness, less than full range of motion, and neck and low
back pain; he denied numbness, tingling, tremors, and weakness.
(R. 526.)  Examination showed that he had less than full range of
motion in his neck and low back, pain on movement and palpation of
his low back, full range of motion of his extremities, and his
motor strength was 5/5 throughout, deep tendon reflexes were +2
throughout, sensory intact, and gait within normal limits.  (*Id.*)

In October 2012, Plaintiff complained of increased pain in the
neck and down his arms.  (R. 533.)  He reported to Dr. Klynowsky
that a specialist had told him surgery was not an option.  (*Id.*)
Review of Systems indicated that Plaintiff denied muscle weakness,
pain, joint stiffness, numbness, tingling, or tremors.  (R. 533-
34.)  Examination showed Plaintiff's neck was supple with full
range of motion, he had full range of motion in his extremities,
and his motor strength was 5/5 throughout, deep tendon reflexes
were +2 throughout, sensory intact, and gait within normal limits.
(R. 534.)

Plaintiff again saw Dr. Klynowsky on December 6, 2012, and reported that his back pain was worse than usual. (R. 537.) Review of Systems indicated low back pain and tightness. (*Id.*) Physical examination showed that Plaintiff had pain, tightness, spasm, and decreased range of motion in his lower lumbar region, his neck was within normal limits, upper and lower extremities were normal, and his deep tendon reflexes were normal. (R. 537-38.) Dr. Klynowsky diagnosed lumbar strain and spasm. (R. 538.)

In January 2013, Plaintiff complained of increased pain. (R. 541.) Review of systems indicated that Plaitniff reported muscle weakness, pain, join stiffness, swelling, decreased range of motion, numbness, tingling, and weakness in his upper back and arms. (R. 540.) Examination showed that his neck was supple but he had abnormal range of motion, tenderness in his neck and upper back, muscle tightness and spasms, full range of motion in his extremities, 5/5 motor strength throughout, no tremors, sensory intact, and normal gait. (R. 541.)

Plaintiff saw Dr. Jacobs on February 14, 2013. (R. 668.) Progress Notes indicated Plaintiff was last seen on February 22, 2012. (*Id.*) Plaintiff complained of constant neck pain with radiation in shoulders, triceps, and ulnar forearm, left greater than right, without hand involvement. (*Id.*) Plaintiff said he also experienced numbness, tingling, weakness, difficulties with fine motor skills, and added that he dropped things. (*Id.*) He

14

said his pain was worse at night when he lies down and in the morning, and there were no relieving positions. (*Id.*)  He was on a fentanyl patch, vicodin, percocet, and neurontin, and reported that he had no physical therapy since his surgery.  (*Id.*)  Dr. Jacobs noted that Plaintiff was supposed to have an EMG as directed at his last visit on February 22, 2012, but it appeared that he cancelled both visits.[2]  (*Id.*)  The Progress Notes also indicate under "Planning for return to work" that Plaintiff was "working currently as contractor."  (R. 669.)

Plaintiff saw Dr. Klynowsky five times in 2013 for follow up of his chronic medical problems and associated neck and back pain. In March, May, June, and September, the Review of Systems indicated that Plaintiff denied muscle weakness, pain, joint stiffness, range of motion problems, instability, swelling, numbness, tingling, tremors, or weakness.  (R. 594-95, 603, 609-10, 613-14.)  Physical examination showed that his neck was supple with full range of motion, he had full range of motion in his extremities, his upper and lower extremities appeared symmetrical, motor strength 5/5 throughout, deep tendon reflexes +2 throughout, sensory intact, and gait within normal limits.  (R. 595, 603, 610, 614.)  In November

---

[2]  Dr. Jacobs noted that Plaintiff's wife said he had the requested studies.  (R. 668.)  Plaintiff's wife was going to check to see if they had been done at an outside facility and fax the results to Dr. Jacobs.  (R. 669.)  Such studies are not contained in the administrative record.  The record contains subsequent upper and lower extremity EMG reports dated December 17, 2013.  (R. 682, 687.)

2013, Plaintiff complained of worsening pain down his arms and hand numbness, and he reported that he sometimes dropped things.  (R. 590.)  Dr. Klynowsky recorded that Plaintiff reported that he was "[h]aving a hard time at work."  (*Id.*)  In the Review of Systems, Plaintiff reported joint stiffness, less than full range of motion, instability, and numbness and tingling.  (R. 590-91.)  Physical examination showed that he had less than full range of motion and tenderness in his neck, decreased range of motion and lumbar spine tenderness, spasms throughout his back and neck to his sacrum, 5/5 motor strength throughout, and sensory intact.  (R. 591.)

On December 12, 2013, Plaintiff was seen by Albert D. Janerich, M.D., on Dr. Klynowsky's referral for evaluation and treatment of musculoskeletal pain.  (R. 681.)  Dr. Janerich noted that Plaintiff was in obvious discomfort and had slow, guarded movements.  (*Id.*)  Evaluation of the cervicothoracic and thoracolumbar spine showed spasm, limited range of motion about the neck, and thoracolumbar mobility reduced to 50 degrees.  (*Id.*)  Dr. Janerich added that "pain and guarding precluded an accurate assessment of the complete neurologic examination."  (*Id.*)  Dr. Janerich ordered EMGs of the upper and lower extremities and planned to see Plaintiff again in six weeks unless he had a flare up.  (*Id.*)  Dr. Janerich also noted "[n]o work was recommended, under any circumstances."  (*Id.*)

The EMGs were done on December 17, 2013.  (R. 682, 687.)  The

16

upper extremity study indicated that the evaluation was "in keeping
with bilateral carpal tunnel syndrome, perhaps more severe on the
left than the right side," and also "in keeping with right C5/6
radiculopathy." (R. 682.)   The lower extremity study showed
bilateral lumbosacral radiculpathies at the S1/2 level on the left
side and at the L5, S1 and S2 level on the right side.   (R. 687.)

At his return visit to Dr. Janerich on January 2, 2014,
Plaintiff reported that he remained in pain and lost sleep because
of it.   (R. 692.)   On examination, Dr. Janerich recorded that
Plaintiff was depressed, his movements were slow and guarded, and
there was spasm in the neck and lower back with restricted motion.
(*Id.*)   Dr. Janerich noted that his only recommendation was to
increase one of his medications and continue with others as
prescribed.   (*Id.*)   He planned to see Plaintiff again in four to
six months unless a flare up occurred.   (*Id.*)

## 2.   **Opinion Evidence**

At his post-surgery visit with Dr. Jacobs on November 22,
2011, Dr. Jacobs released him to go back to work: light duty with
no heavy lifting (R. 410.)

On January 9, 2013, State agency consultant, Kurt Maas, M.D.,
completed a Residual Functional Capacity Assessment for the date
last insured of March 31, 2012.   (R. 95-97.)   Dr. Maas opined that
Plaintiff could lift and/or carry twenty pounds occasionally and
ten pounds frequently; he could stand and/or walk for six hours in

17

an eight-hour day and sit for the same length of time; he was unlimited in his abilities to push and/or pull; he could occasionally climb ramps and/or stairs, balance, stoop, kneel and crouch; he could never climb ladders/ropes/scaffolds and crawl; and he should avoid concentrated exposure to extreme cold, vibrations, and hazards.  (*Id.*)

3.   **Hearing Testimony**

At the January 21, 2014, hearing, Plaintiff stated that he believed he was unable to work full time due to the strain on his back with pain that runs down through his arms and legs and also because of the pain medications prescribed by his primary care provider, Denise Klynowsky, D.O.  (R. 58-59.)  Plaintiff testified that he had improvement after the November 2011 surgery but at the time of the hearing he had four pinched nerves in his back and he was able to do very little.  (R. 60.)  He said his wife had to help him dress and he spends most of his day on the couch in the living room.  (R. 60-61.)  He said he drives very little, his wife does everything around the house, and she or others do the outside chores.  (R. 61-62.)  Plaintiff testified that his condition had "lately . . . been getting worse and worse."  (R. 64.)  When asked by ALJ Wing whether he was able to do more in 2012, he responded that he had been.  (*Id.*)

Plaintiff said he occasionally did odd jobs for friends, like wiring jobs at their houses and he had not done more than that

since before his November 2011 surgery.  (R. 55, 65-66.)  He
testified that before his surgery, he worked for a neighbor,
"helping him out," about five days a week (twenty to thirty hours)
earning about $300 per week (in cash).  (R. 67-69.)  Plaintiff
clarified that he stopped doing this about four months before his
surgery and he did not have records of his payments or hours.  (R.
69.)

When asked about a notation by his primary care physician in
her November 15, 2013, office notes, "[h]aving a hard time at work"
(R. 71 (quoting R. 590)), Plaintiff said he was not working at the
time but wanted to go to work (*id.*).

**4.   <u>ALJ Decision</u>**

ALJ Wing issued his decision on February 28, 2014.  (R. 32-
42.)  He made the following Findings of Fact and Conclusions of
Law:

> 1.   The claimant has met the insured status
>       requirements of the Social Security Act
>       on March 31, 2012.
>
> 2.   The claimant did engage in substantial
>       gainful activity during the period from
>       his alleged onset date of December 1,
>       2010 through his date last insured of
>       March 31, 2012 (20 CFR 404.1571 et
>       seq.).
>
> 3.   Through the date last insured, the
>       claimant had the following severe
>       impairments: spinal disorder with
>       radiculopathy, status post cervical
>       spinal surgery, and bilateral carpal
>       tunnel syndrome (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he is limited to occupations that require no more than occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, and climbing on ramps and stairs.  The claimant must avoid occupations that require climbing on ladders, overhead work, or work with frequent movements of the head.  In addition, he is limited to occupations that require no more than occasional pushing and pulling with the upper and lower extremities, with no prolonged writing or prolonged keyboard work.  He must avoid concentrated prolonged exposure to environments with temperature extremes, extreme dampness, and humidity; and must avoid all exposure to dangerous machinery and unprotected heights.  Due to pain and side effects to related pain medications, the claimant is limited to occupations requiring no more than simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few workplace changes.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on March, 26, 1969 and was 43 years old, which is defined

as a younger individual age 18-44, on
the date last insured (20 CFR 404.1563).

8.   The claimant has at least a high school
education and is able to communicate in
English (20 CFR 404.1564).

9.   Transferability of job skills is not
material to the determination of
disability because using Medical-
Vocational Rules as a framework supports
a finding that the claimant is "not
disabled," whether or not the claimant
has transferable job skills (see SSR 82-
41 and 20 CFR Part 404, Subpart P,
Appendix 2).

10.  Through the date last insured,
considering the claimant's age,
education, work experience, and residual
functional capacity, there were jobs
that existed in significant numbers in
the national economy that the claimant
could have performed (20 CFR 404.1569
and 404.1569(a)).

11.  The claimant was not under a disability,
as defined in the Social Security Act,
at any time from December 1, 2010, the
alleged onset date, through March 31,
2012, the date last insured (20 CFR
404.1520(g)).

(R. 34-41.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[3]  It is necessary for the

---

[3]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less that 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

---

disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step one of the sequential evaluation process when the ALJ determined that Plaintiff engaged in substantial gainful activity during the period from the alleged onset date of December 1, 2010, through his date last insured of March 31, 2012, and alternatively at step five when the ALJ found that, even if he had not engaged in substantial gainful activity during the relevant time period, Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 34-35, 40-41.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see*

23

*also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)*.*  The Third

Circuit Court of Appeals further explained this standard in *Kent v.*

*Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel*
> *non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to

analyze all evidence.  If she has not done so and has not

sufficiently explained the weight given to all probative exhibits,

"to say that [the] decision is supported by substantial evidence

approaches an abdication of the court's duty to scrutinize the

record as a whole to determine whether the conclusions reached are

rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.

1979).  In *Cotter*, the Circuit Court clarified that the ALJ must

not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .."). "However, even if the Secretary's factual findings are supported by

substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As noted previously, Plaintiff asserts that the Acting Commissioner's decision should be remanded for the following reasons: 1) the ALJ erred by finding Plaintiff did not meet his burden at step one and that he engaged in substantial gainful activity after July 2011; 2) the ALJ erred in failing to find any right shoulder impairments to be "severe" and by failing to include any resulting limitations within the RFC assessment; 3) the ALJ did not fulfill his duty to fully and fairly develop the record and erred by not ordering a consultative examination; and 4) the ALJ

26

did not properly evaluate Plaintiff's credibility.  (Doc. 11 at 7-17.)

## A.    *Step One Determination*

Plaintiff first argues the ALJ's finding that he did not meet his burden at step one is erroneous and is not supported by substantial evidence because it incorrectly applies the statutory and regulatory definition of disability; specifically, the ALJ did not consider whether Plaintiff's impairment was "'expected to last for a continuous period of not less than 12 months' after the date last insured."  (Doc. 11 at 7-8 (citing 42 U.S.C. § 423(d)(1)(a); 20 C.F.R. § 1505(a)).)  Defendant maintains the ALJ properly found Plaintiff did not meet his burden of proving he did not engage in substantial gainful activity and the ALJ also made the alternative finding that Plaintiff was not disabled at step five.  (Doc. 12 at 12-14.)  I conclude the claimed step one error is not cause for remand because ALJ Wing alternatively proceeded through the five step sequential process and ultimately found Plaintiff not disabled at step five.  (*See* R. 35-41.)

At step one ALJ Wing considered only the period up to March 31, 2012, Plaintiff's date last insured.  (R. 34-35.)  He reached the following overall conclusion: "The claimant did engage in substantial gainful activity during the period from his alleged onset date of December 1, 2010 through his date last insured of March 31, 2012."  (R. 34.)  In explaining his conclusion, he noted

that Plaintiff testified that he worked after the alleged onset date until about July 2011, earning about $300.00 per week.  (R. 35.)  He further explained that

> [i]n the absence of any additional evidence, the undersigned finds that claimant's sworn testimony at hearing establishes that he has worked above SGA through at least July 2011, earning approximately $1,200 or more per month (20 C.F.R. § 404.1574).  The time period from July 2011 until the date last insured of March 31, 2012, is less than twelve (12) months duration.  Accordingly, claimant has not met his burden of proof at step one of the sequential evaluation process that he was not engaged in substantial gainful activity during the relevant time period.
>
> In the alternative, assuming claimant's work activity after his alleged onset date of December 1, 2010 through his date last insured of March 31, 2012 did not rise to the level of substantial gainful activity, the undersigned makes the following alternative findings in accordance with the sequential evaluation process.

(R. 35.)

Plaintiff does not dispute that he stopped working about four months before his surgery on November 8, 2011, i.e., he stopped working in about July of 2011.  (Doc. 11 at 7 & n.3.)  With this admission, Plaintiff effectively, after the fact, amends his alleged onset date.  However, the ALJ's alternative step one determination renders it unnecessary to make inferences and parse semantics as to the propriety of the ALJ's finding and Plaintiff's related assertions.  This is so because the ALJ's consideration of

all steps of the sequential evaluation process means that, based on the definition of "disability," he necessarily considered whether Plaintiff had a severe impairment which was "expected to last for a continuous period of not less than 12 months" as he moved beyond step one.  42 U.S.C. § 423(d)(1)(A).  Furthermore, ALJ Wing's review of record evidence and the analysis provided in support of his conclusions shows that he considered evidence post-dating the date last insured of March 31, 2012, in making his residual functional capacity assessment.  (R. 38-40.)  Therefore, any step one error would be harmless and would not provide a basis for remand.

**B.    *Step Two Error***

Plaintiff contends the ALJ erred in failing to find any right shoulder impairments to be "severe" and by failing to include any resulting limitations within the residual functional capacity assessment and this error was harmful.  (Doc. 11 at 10; Doc. 13 at 4).)  Defendant maintains the ALJ properly accounted for Plaintiff's credibly established limitations and his failure to discuss Plaintiff's shoulder impairment at step two was harmless error.  (Doc. 12 at 14-16.)  I conclude that the alleged step two error is not cause for remand.

If the sequential evaluation process continues beyond step two, failure to properly consider a specific impairment at step two may be deemed harmless if the functional limitations associated

with the impairment are accounted for in the RFC.  *Salles v. Commissioner of Social Security*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (not precedential) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)).  In other words, because the outcome of a case depends on the demonstration of functional limitations, where an ALJ identifies at least one severe impairment and ultimately properly characterizes a claimant's symptoms and functional limitations, the failure to identify a condition as severe is deemed harmless error.  *Garcia v. Commissioner of Social Security*, 587 F. App'x 367, 370 (9th Cir. 2014) (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)); *Burnside v. Colvin*, Civ. A. No. 3:13-CV-2554, 2015 WL 268791, at *13 (M.D. Pa. Jan. 21, 2015); *Lambert v. Astrue*, Civ. A. No. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009).

Defendant concurs that Plaintiff is correct that ALJ Wing did not discuss his shoulder impairment at step two.  (Doc. 12 at 15.) Defendant counters Plaintiff's contention that the ALJ did not acknowledge related symptoms with the assertion that the ALJ adequately accounted for shoulder limitations and Plaintiff has not identified any additional limitations that he feels the ALJ should have included.  (Doc. 11 at 12; Doc. 12 at 15.)   The RFC limitations noted include no overhead work, no climbing ladders, and no more than occasional pushing and pulling with the upper extremities.  (Doc. 12 at 15 (citing R. 37).)

This step two inquiry is fact specific and, in the cases cited by Plaintiff, *Awad v. Colvin*, Civ. A. No. 3:14-CV-1054, 2015 WL 1811692 (M.D. Pa. Apr. 21, 2015), and *Martin v. Colvin*, Civ. A. No. 3:14-CV-1730, 2015 WL 1499874 (M.D. Pa. Apr. 1, 2015), and others wherein this Court has deemed the step two error cause for remand, *see*, *e.g.*, *Butler v. Colvin*, Civ. A. No. 3:15-CV-192315 (M.D. Pa. filed May 12, 2016), the plaintiff pointed to specific functional limitations related to the impairment and specific findings supporting those limitations.  2015 WL 1499874, at *12-13; 2015 WL 1811692, at *12-14.  Here Plaintiff does not point to any such evidence, and our review of the record shows some consideration of the problem in January and February 2012 (R. 473-75, 646-48, 653-55), and no appreciable follow up or symptom evaluation thereafter (R. 525-41, 668-69, 681).  Therefore, the Court agrees with Defendant that Plaintiff has not shown that the claimed step two error was harmful, and Plaintiff has not shown that this claimed error is cause for remand.

## C.  *Development of the Record*

Plaintiff next claims the ALJ did not fulfill his duty to fully and fairly develop the record and erred in failing to order a consultative examination.  (Doc. 11 at 12.)  Defendant responds that the ALJ fulfilled his duty to develop the record and was under no obligation to order a consultative examination.  (Doc. 12 at 17.)  I conclude Plaintiff has not shown that this claimed error is

31

cause for remand.

Although the duty to assist the claimant and develop the record is well established, the duty is not unlimited. The requirement does not necessarily come into play where "there was sufficient evidence in the medical records for the ALJ to make her decision." *Moody v. Barnhart*, 114 F. App'x 495, 501 (3d Cir. 2004) (not precedential); *see also Griffin v. Commissioner of Social Security*, 303 F. App'x 886, 890 n.5 (3d Cir. 2009) (not precedential). If the record is inadequate for proper evaluation of the evidence, the ALJ's duty to develop the record is triggered. *See*, *e.g.*, *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).

Development of the record may include a consultative examination. The relevant regulation provides that such an examination may be required in certain situations such as when there is a need to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to allow a determination to be made on the claim. 20 C.F.R. § 404.1519a(b)(4). By way of example, the regulation states that a consultative examination might be purchased to secure needed medical evidence in the following situations: 1) when additional evidence needed is not contained in the records of the medical sources; 2) evidence that may have been available from medical sources cannot be obtained for reasons beyond the claimant's control; 3) highly specialized or technical evidence is need and is not available from medical

sources; and 4) there is an indication of a change in the claimant's condition that is likely to affect the ability to work, but the current severity of the claimant's impairment is not established.  20 C.F.R. § 404.1519a(b)(4).

In support of the claimed error, Plaintiff points to the ALJ's acknowledgment that subsequent medical evidence showed a deterioration in Plaintiff's condition and the fact that the ALJ rejected the only medical opinions of record.  (Doc. 11 at 14.)

Plaintiff urges the Court to conclude that the change-in-condition basis for a consultative examination applies here.  (Doc. 11 at 13.)  The first problem with Plaintiff's argument is that he inaccurately presents consultative examination considerations in terms of absolute requirements: he states that "[a] consultative examination *is required* when "[t]here is an indication of a change in [the claimant's] condition that is likely to affect [his or her] ability to work, but the current severity of [the] impairment is not established'" (Doc. 11 at 14 (emphasis added) (quoting 20 C.F.R. § 404.1519a(b)(4)) (alterations in Plaintiff's quotation)); the regulation states "*we might purchase*" a consultative examination in such a situation, 20 C.F.R. § 404.1519a(b)(4) (emphasis added).[4]

---

[4]  Plaintiff also urges the Court not to consider an argument that "no consultative examination was required because such an examination would have necessarily occurred after the Plaintiff's date last insured."  (Doc. 11 at 16.)  The potential rather than mandatory directives of the regulation discussed in the text

Second, while Plaintiff's condition worsened after the December 2011 sneezing incident as recorded at January and February 2012 office visits (R. 501-02, 646-48, 653-55), medical evidence is sparse for the remainder of 2012 (with no recorded office visits from February 23, 2012, to August 3, 2012) and four out of five office visits in 2013 are routine (R. 594-95, 603, 609-10, 613-14). The record shows the significant worsening of Plaintiff's condition and the findings cited by the ALJ ("clinical examinations demonstate he is in obvious discomfort, with slow guarded movements, spasms in his neck and low back, and restricted range of motion in his neck and thoracolumbar spine" (R. 39)) occurred in late 2013.  At his November 2013 visit with Dr. Klynowsky, Plaintiff reported that he had worsening pain down his arms and hand numbness, and he reported that he sometimes dropped things, and physical examination showed that he had less than full range of

---

indicate that the time when the examination would necessarily have occurred could certainly be a reason for the ALJ not to consider such an examination beneficial—-Plaintiff's assertions regarding what the ALJ *could* have done (Doc. 11 at 16-17) in no way undermine the propriety of what he did in this case.

Given the March 31, 2012, date last insured, October 31, 2012, DIB application date, and the date of the ALJ's consideration of the evidence--January and February of 2014--the ALJ would not have been in a position to order a consultative examination until almost two years after the date last insured.  The severity of Plaintiff's condition in early 2014 was not at issue--the question was whether he met the statutory definition of disability as of March 31, 2012. *See* 42 U.S.C. § 423(d)(1)(A).  Thus, under the "expected to last" prong of the definition, the absolute last date relevant to the disability inquiry was March 30, 2013.

motion and tenderness in his neck, decreased range of motion and lumbar spine tenderness, spasms throughout his back and neck to his sacrum, 5/5 motor strength throughout, and sensory intact. (R. 590-91.) The language used in the ALJ's reference to clinical examinations quoted above indicates that he is referencing Dr. Janerich's December 12, 2013, and January 2, 2014, evaluations-- examinations which took place over a year and a half after Plaintiff's date last insured. (*See* R. 681, 692.) Given this timeline showing that significant worsening of Plaintiff's condition occurred well after the relevant time period, there is no basis to conclude that the ALJ erred by failing to order a consultative examination.

Further, Plaintiff's argument that a consultative examination was needed because the ALJ rejected the two medical opinions of record (Doc. 11 at 13-14) is not based on an accurate assessment of the ALJ's decision.[5] ALJ Wing did not reject the opinions. ALJ Wing gave "limited weight" to the neurosurgeon's November 22, 2011, opinion that Plaintiff could return to light duty work, and he gave "great weight" to Dr. Maas's January 9, 2013, opinion that

---

[5] To the extent Plaintiff infers that the RFC must be directly supported by a medical opinion (Doc. 11 at 15-16), the Court agrees with Defendant that an ALJ is not required to base his RFC assessment on a medical opinion because RFC is an administrative finding reserved to the ALJ (Doc. 12 at 19 (citing *Cummings v. Colvin*, No. 1:14-CV-251, 2015 WL 4092321, at *6 (W.D. Pa. July 7, 2015))).

Plaintiff was not precluded from doing all work during the relevant time period.[6]  (R. 39-40.)

In sum, Plaintiff has not shown that this is a case where ALJ Wing's duty to develop the record came into play because there was insufficient evidence in the medical records for the ALJ to make his decision.  *Moody*, 114 F. App'x at 501.  Therefore, Plaintiff's claimed error is not cause for remand.

## D.   *Plaintiff's Credibility*

Plaintiff's final claimed error is that the ALJ did not properly evaluate his credibility and, as a result, his RFC assessment, VE hypothetical questions, and step five findings are not supported by substantial evidence.  (Doc. 11 at 17.)  Defendant contends that the ALJ properly evaluated Plaintiff's credibility. (Doc. 12 at 20.)  I conclude Plaintiff has not shown that this claimed error is cause for remand.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'"  *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility

---

[6]   Regarding Dr. Maas's opinion, the ALJ found that "the objective evidence, when combined with the claimant's subjective complaints, support a more restrictive residual functional capacity to a sedentary exertional level."  (R. 40.)

determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p.

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an

underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. *Id.* In so doing, the medical evidence of record is considered along with the claimant's statements. *Id.*

The regulations provide that factors which will be considered relevant to symptoms such as pain are the following: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

The Third Circuit has explained:

> An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). "While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of

> the pain itself." *Green* [*v. Schweiker*, 749
> F.2d 1066, 1071 (3d Cir. 1984)].  Where
> medical evidence does support a claimant's
> complaints of pain, the complaints should
> then be given "great weight" and may not be
> disregarded unless there exists contradictory
> medical evidence.  *Carter* [*v. Railroad
> Retirement Bd.*, 834 F.2d 62, 65 (3d Cir.
> 1987)]; *Ferguson*, 765 F.2d at 37.

*Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

Plaintiff relies on *Mason* to support his argument that his complaints of pain may not be disregarded unless there is contrary medical evidence and the ALJ has cited no such evidence.  (Doc. 11 at 18.)  Plaintiff points to "objective evidence of some condition that could reasonably produce pain" (Doc. 11 at 18), listing various diagnostic tests and a single physical examination in the margin (*id.* at 18 n.4).

Plaintiff's reliance on *Mason* is misplaced and his contention that the ALJ erred by not citing contradictory medical evidence does not support the claimed error because, under the facts of this case, the ALJ was under no obligation to do so.  While the diagnostic testing cited by Plaintiff is "evidence of some condition that could reasonably produce pain" (Doc. 11 at 18 & n.4), ALJ error is not implicated for several reasons.

First, under *Mason*, the degree of deference due depends on whether there is evidence of some condition that could reasonably produce pain or medical evidence supporting the claimant's complaints of pain: with evidence of a condition which could cause

39

pain, complaints of pain are due "serious consideration"; with medical evidence supporting the complaints themselves, the complaints are due "great deference" and can only be disregarded if there is contradictory medical evidence. *Mason*, 994 F.2d at 1067-68.  As stated in *Sweeney v. Colvin*, No. 3:13-CV-2233, 2014 WL 4294507, at *12 (M.D. Pa. Aug. 28, 2014), *Mason* only requires contrary medical evidence "when the medical evidence supports Plaintiff's complaints of pain, not the medically determinable impairment that could reasonably be expected to produce pain.  When medical evidence supports only the underlying impairment, and not the subjective symptoms, an ALJ only needs to provide 'serious consideration' to the claimant's complaints."  By his own admission, Plaintiff relies on "objective evidence of some condition that could reasonably produce pain."  (Doc. 11 at 18.) Therefore, under *Mason*, the evidence relied upon shows that Plaintiff's complaints of pain were due "serious consideration" rather than "great deference" and the need for contradictory medical evidence.[7]

---

[7]  The facts in *Mason* differ significantly from those here. In *Mason*, the plaintiff's complaints of pain were substantiated by a medical report.  The Court stated that "the ALJ's treatment of appellant's complaints of pain cannot stand in light of our holding that the ALJ was not on sound ground in rejecting Dr. Hillsman's medical report.  Had the ALJ given due consideration to Dr. Hillsman's medical report, the ALJ's analysis of the appellant's complaints of pain might have been significantly affected."  994 F.2d at 1068.  *Mason* went on to explain that the ALJ mainly relied on a report from another doctor, and, by that report, the claimant would not appear to be in great pain where Dr. Hillsman's report

Second, of the four studies referenced by Plaintiff (Doc. 11 at 18 n.4), only one is directly pertinent to the relevant time period.  The MRI showing disc extrusion at C6-7 was done in April 2011 (R. 218) when Plaintiff was engaged in substantial gainful activity and, therefore, the study cannot be considered medical evidence of his claimed disabling pain during the relevant time period.  The upper extremity EMG study showing bilateral carpal tunnel syndrome and cervical radiculopathy and the lower extremity EMG study showing lumbosacral radiculopathies were both done in December 2013--over a year and a half after the date last insured. (R. 682, 687.)  Because Plaintiff's physical examinations from March 2013 through September 2013 contained no notations of pain and normal findings (neck supple with full range of motion, full range of motion in extremities, upper and lower extremities appeared symmetrical, motor strength 5/5 throughout, deep tendon reflexes +2 throughout, sensory intact, and gait within normal limits) (R. 595, 603, 610, 614), December 2013 studies cannot be

---

depicts a patient experiencing very substantial pain.  Dr. Hillsman recorded various exercises during the course of the exam produced "lumbar hamstring pain," "severe lower abdominal pain," and "diffuse lumbar, flank and gluteal pain." Indeed, when examined by Dr. Hillsman, appellant apparently suffered from a spasm of such severity that Dr. Hillsman interrupted the examination for a period of time.

994 F.2d at 1068.

41

considered medical evidence supporting his claimed disabling pain during the relevant period.  Finally, the MRI and examination findings showing shoulder impingement syndrome were done during the relevant time (February 22, 2012) (R. 653-55), but they cannot be considered medical evidence supporting Plaintiff's complaints of disabling pain in that the extensive review of medical evidence set out in the background section of this Memorandum shows that Plaintiff's allegations regarding his shoulder pain/problem were of limited duration.  *See supra* pp. 3-18.  Specifically, notes from Plaintiff's office visits for the remainder of 2012 show that Plaintiff did not complain of shoulder pain and physical examination did not reveal any.  (R. 525-26, 529-30, 533-34, 537-38.)  Therefore, evidence cited by Plaintiff at most shows that he had some conditions that could reasonably produce pain, entitling his complaints to serious consideration only.  Because Plaintiff does not point to the type of evidence described in *Mason* and *Sweeney* as supportive of complaints of pain which may not be disregarded without contrary medical evidence, he has not met his burden of showing that the ALJ erred on the basis alleged.[8]

---

[8]   Independent review of the record does not show medical evidence supporting disabling pain.  Plaintiff's treating physicians did not often make any notation about pain experienced by Plaintiff.  Occasionally pain symptoms were corroborated by physical examination but not consistently during the relevant time period.  Importantly, because Plaintiff acknowledges he was engaged in substantial gainful activity up until about July 2011, pain recorded before that date did not preclude Plaintiff from working at a level that was considered both substantial and gainful under

Plaintiff next asserts that the ALJ's credibility determination is error because two of the bases for his adverse credibility findings--objective verification of activities of daily living and a physician's statement supporting alleged limitations-- are not grounded in applicable regulations, rulings, or caselaw. (Doc. 11 at 19 (citing R. 39).)   Defendant responds that there is no requirement that Plaintiff produce medical evidence of his limited activities, but there is no prohibition on an ALJ's observation that such evidence is lacking, and Plaintiff has not pointed to any such prohibition.   (Doc. 12 at 22-23.)   In his reply

---

the regulations.  20 C.F.R. § 404.1572(a).  During the relevant period, pain found on examination in August and November 2011 ( R. 255, 264) was either relieved by the November 2011 surgery or considered not to be disabling by Plaintiff when he requested to be released to return to work in late November.  (R. 410.)  Complaints of pain were verified on examination at January and February 2012 office visits (R. 473, 646, 653) but from then through September 2013, pain on examination was rarely noted (R. 526, 537-38) and most exams were normal (R. 530, 533-34, 595, 603, 610, 614).  A comparison of the pain-related observations recorded in this case during the relevant time period and those attributed to Dr. Hillsman in *Mason*, shows that here the claimed severity of pain during the relevant time is not supported by the type of medical evidence that would trigger the requirement that Plaintiff's complaints of pain could only be disregarded if there were contradictory medical evidence.  994 F.2d at 1067-68.  Furthermore, because the statutory definition of "disability" and the entitlement to DIB is based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical . . . impairment . . . which has lasted or can be expected to last for *a continuous period* of not less that 12 months," 42 U.S.C. § 423(d)(1)(A) (emphasis added), sporadic notations of *some* pain during the relevant time period do not provide the medical evidence necessary to support Plaintiff's allegations of disabling pain which would trigger *Mason's* contradictory-evidence requirement.

43

brief, Plaintiff continues to aver that the ALJ imposed "extra-legal requirements." (*See* Doc. 13 at 10.) I conclude that the ALJ's reference to the lack of objective verification of activities of daily living and medical evidence supporting limitations do not indicate an imposition of "extra-legal requirements." (*Id.*) Rather, they are commentary on the state of the record. Therefore, I concur with Defendant that the ALJ did not err in making the referenced observations.

Plaintiff also criticizes the ALJ's assessment of his activities of daily living, stating that "none of the activities cited by the ALJ are inconsistent with Plaintiff's allegations that he cannot work on a regular and continuing basis, meaning 8 hours per day 5 days per week." (Doc. 11 at 20.) The ALJ cited many activities Plaintiff was able to do during the relevant time period, including mowing the grass and doing household repairs and found that, overall, the activities showed greater physical functional capacity than alleged. (R. 39.) He also cited Plaintiff's conservative treatment and the relatively limited medical evidence in support of his assessment of Plaintiff's credibility. (*Id.*) A review of the record does not show that this assessment was error. Given the deference due an ALJ's credibility determination, Plaintiff has not demonstrated that the ALJ's consideration of his activities of daily living in particular or credibility determination in general is cause for remand.

Finally, Plaintiff criticizes the ALJ's consideration of his complaints of numbness and tingling in his fingers related to his carpal tunnel syndrome and states the ALJ did not account for these symptoms in his RFC.  (Doc. 11 at 21; Doc. 13 at 5.)  I conclude that any claimed error related to the ALJ's treatment of Plaintiff's carpal tunnel syndrome or symptoms of numbness and tingling in his fingers would be harmless because the diagnosis was not made until December 2013 (R. 682), he complained of some symptoms in January and February 2013 (R. 540, 668) but did not complain of them again until November 2013 (R. 590), and he specifically denied numbness and tingling at numerous office visits before and after the January and February 2013 visits (*see* R. 526, 529-30, 594-95, 603, 609-10, 613-14, 653-54).[9]  Because Plaintiff denied numbness and tingling at almost every office visit during the relevant time period, the ALJ's failure to discuss Plaintiff's

---

[9] ALJ error on this issue may include his conclusion that Plaintiff had the severe impairment of bilateral carpal tunnel syndrome "through the date last insured." (R. 35.)  The medical evidence cited in the text does not indicate a diagnosis of bilateral carpal tunnel syndrome and/or allegedly related symptoms before March 31, 2012, the date last insured.

In his reply brief, Plaintiff states "[b]ecause the impairment was properly accepted by the ALJ, the Commissioner cannot refute such a finding now." (Doc. 13 at 5.)  Plaintiff cites no legal authority for this proposition nor does he point to medical evidence supporting the propriety of the ALJ's step two decision. In his initial brief, "objective evidence" cited by Plaintiff in support of the claimed limitations (Doc. 11 at 21 (citing R. 682)) is the December 2013 EMG study which, as discussed previously in the text, does not provide support for limitations during the relevant time period.

credibility regarding the symptoms or specifically include fingering limitations allegedly resulting from the symptoms in the RFC must be deemed harmless error.

### V. Conclusion

For the reasons discussed above, Plaintiff's appeal of the Acting Commissioner's denial of benefits (Doc. 1) is denied.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: June 1, 2016

46